In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 19-2090 & 19-2101

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JONATHAN EYMANN and GARY LYONS,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Central District of Illinois.
No. 3:15-cr-30021 — **Sue E. Myerscough**, *Judge.*

ARGUED JANUARY 22, 2020 — DECIDED JUNE 12, 2020

Before WOOD, *Chief Judge*, and SYKES and HAMILTON, *Circuit Judges.*

WOOD, *Chief Judge.* Jonathan Eymann and his uncle, Gary Lyons, were flying from California to Pennsylvania when they stopped around midnight at a small public airport in Litchfield, Illinois. Suspecting drug trafficking, law enforcement officers followed the pair to a nearby hotel and confronted them in the hotel's parking lot. The encounter ended in their

arrests and the discovery of 65 pounds of marijuana in their airplane.

Asserting that the officers had violated the Fourth and Fifth Amendments in a number of ways, Eymann and Lyons filed a joint motion to suppress the evidence against them. After the district court denied the motion, Eymann conditionally pleaded guilty to conspiracy to distribute marijuana, reserving the right to appeal the district court's ruling on their suppression motion. Lyons proceeded to trial, where a jury convicted him of conspiracy to distribute marijuana and aiding and abetting the possession of marijuana with the intent to distribute. Both men now appeal the district court's denial of their motion to suppress. Finding no reason to set aside either the district court's factual findings or its ultimate conclusion, we affirm.

**I**

On July 20, 2013, Department of Homeland Security ("DHS") Special Agent Glen Harrington received a call and an email from Agent Jeff Spencer of DHS's Air and Marine Operations Center ("AMOC") about an airplane that would be landing that night at the Litchfield Municipal Airport. Spencer identified the plane as a single-engine Cessna owned by Elaine Pate and noted that the pilot would be Pate's husband, Lyons. AMOC had been monitoring the Cessna for months. Although it knew nothing inculpatory about the specific plane, owner, and pilot, AMOC found the airplane's movement patterns and quick-turn trips suspicious.

Spencer's email, which included information collected by AMOC research specialist Robert Keller, identified the airplane by its tail number. The email also indicated that on the

weekend of May 24, 2013, an unknown pilot flew the airplane from California to Pennsylvania. The plane stayed in Pennsylvania for only about fifteen hours before returning to California. Then, on the weekend of June 21, 2013, it again flew from California to Pennsylvania and back; this time it remained in Pennsylvania for only five hours. AMOC identified Lyons as the pilot during the second trip.

The email noted additional circumstances that Keller found suspicious. In January 2013, the Cessna flew to Watsonville and Cloverdale, California, towns close to a known marijuana smuggling hub. During the May and June 2013 trips, the plane had landed at small, rural airports late at night to refuel when the airports were otherwise closed. Keller also found it odd that the plane apparently had flown through a serious storm during one of its cross-country trips. Finally, he reported that Lyons had been in some economic trouble and had just emerged from bankruptcy in 2012.

After evaluating AMOC's information, Harrington concluded that the pilot might be using the plane to smuggle drugs. This was consistent with his experience: every time in the past when Harrington had pursued a lead based on information provided by AMOC, it led to the seizure of illicit drugs. Harrington relayed Spencer's tip to his supervisor, Resident Agent-in-Charge Michael Mitchell. Harrington then called Lieutenant Lee Jarman of the Litchfield Police Department to coordinate assistance. Harrington and Jarman arranged to have a trained drug-detection dog available for use that night. They believed that the Cessna would land, refuel, and take off again, and Harrington wanted to get a sniff of the plane while it was on the ground. Jarman contacted the

department's dog handler, Officer Shane Grammer, and instructed him to be available.

Harrington arrived in Litchfield at around 11:00 p.m. to meet with his team at the police department. After a short briefing, five of them (Mitchell, Harrington, Jarman, former Chief B.J. Wilkinson, and Officer Thomas Melchert) headed to the airport. The officers watched the area for about an hour; during which no airplane landed, there were no vehicles entering or leaving the airport, and the lights were off inside the airport's main building.

Lyons landed the Cessna at around 12:05 a.m. on July 21, 2013. It taxied behind the airport's main building and then parked in an open area. It did not enter a hangar and was not tethered to the ground. Harrington watched as Eymann and Lyons removed cargo from the airplane and entered the building. After a few minutes, the pair left the building and loaded cargo into the airport's courtesy car. (Harrington testified that he thought their cargo included a box, which he found suspicious, but no box was found in the later search. We thus disregard the alleged box.) The courtesy car operates on an honor system. Users simply provide a driver's license number and a signature on a form next to the car keys in the airport building's lobby. Lyons signed out the keys, and the duo left the airport in the courtesy car at around 12:27 a.m.

As the two men drove off, Harrington was concerned that they could be delivering contraband. He saw that possibility as a "more immediate threat" than the parked airplane at the airport. The officers therefore decided to follow the courtesy car. After a short drive, they saw it pull into a Quality Inn parking lot. Lyons, who was driving, parked in the last

available space. The two then got out of the car and began walking to the hotel; as they did so, they noticed the officers.

Mitchell pulled into the lot as Lyons and Eymann were parking. He positioned his truck behind the courtesy car, and Harrington parked nearby. Wilkinson placed his vehicle in front of the courtesy car, thereby effectively blocking the courtesy car from moving in any direction. At 12:32 a.m. Mitchell activated his lights and got out of his truck.

Mitchell walked over to Lyons, showed his credentials, identified himself as a law enforcement officer, and asked to speak with him. Lyons cooperated while Mitchell asked him basic questions such as where he was traveling to and from and the nature of his trip. Lyons replied that he was flying from California to Pennsylvania for work. The exchange was conversational, and Mitchell did not raise his voice.

While Mitchell was speaking with Lyons, Harrington approached and asked for Lyons's identification. After receiving it, he approached Eymann with the same request. Harrington took both identification cards back to his vehicle to check for outstanding warrants.

Meanwhile, as Mitchell continued to speak with Lyons, Lyons suddenly became flush and fainted, collapsing into Mitchell. The officers placed him in the front passenger seat of Wilkinson's vehicle with the door open and the air conditioning on. They did not question him any further at that point about anything other than his medical condition.

While others saw to Lyons, Harrington discovered that neither man had an active warrant. Harrington then approached Eymann and asked him some questions about Lyons's health. He also asked Eymann if he had brought any

marijuana from California. Eymann admitted that he had a small, personal-use, amount of marijuana in the car.

Eymann's admission prompted an escalation in the encounter. Jarman ordered Grammer and his drug-dog Arie to the scene at 12:33 a.m.; they arrived around 12:54 a.m. Grammer and Arie got to work right away, and shortly thereafter Arie positively alerted at the front passenger door seam. Grammer rewarded Arie with a towel to chew on, while the officers opened the car, removed the items, and spaced them out on the ground. (There was some dispute in the district court about the sequence of events: did Arie's alert come first and then the search of the car, or vice versa? Eymann and Lyons have not pursued this on appeal, and so we do not need to resolve the point.) Arie alerted on a piece of luggage, which the officers then searched. Once again, Arie was rewarded. The officers found a small amount of marijuana (about 2.5 grams) within the luggage.

Around the time Arie was sniffing around the courtesy car, Harrington frisked Lyons. During the frisk, Harrington felt what he thought was a stack of money in Lyons's front cargo pocket. Harrington asked Lyons what was in his pocket, and Lyons replied that he had $1,600 in an envelope for fuel and expenses; the envelope actually contained $2,600. Arie later sniffed the envelope and alerted.

After the officers found the marijuana, they handcuffed and arrested both Eymann and Lyons. They then transported the pair back to the airport, which they entered through the airport gate with the permission and assistance of airport agents. The Cessna was still the only airplane on the tarmac, and the airport still looked empty.

Grammer walked Arie around the Cessna for another sniff, and Arie provided another positive alert, followed as before by a reward. The officers opened the plane using a key they had seized from Lyons, and they immediately smelled marijuana. This time the quantity was considerable. The officers placed several bags from inside the plane on the tarmac and had Arie check each one. He alerted on three of them and (following a now-familiar pattern) received a reward. The officers searched the bags and found a total of 65 pounds (roughly 29.5 kilograms) of marijuana. In a later search of the airplane, they also found a firearm.

In July 2013, the Montgomery County State's Attorney charged Eymann and Lyons with possession of over 500 grams of marijuana. They filed a motion to suppress evidence, arguing that Arie was not properly certified through the State of Illinois at the time of the sniffs. Although Arie had completed the necessary training to be certified by the state, his certification had lapsed weeks before as a result of an administrative error. After a hearing, the state court determined that, because of Arie's lapse in certification, Arie's alerts did not provide probable cause. It granted the defendants' motion, and the state later dismissed the charges.

That proved to be just the end of the beginning, not the beginning of the end, of Eymann and Lyons's troubles. On May 6, 2015, a federal grand jury returned an indictment charging both of them with conspiracy to distribute marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(D), and aiding and abetting the possession of marijuana with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D), and 18 U.S.C. § 2. Lyons was also charged with

carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

In October 2015, Lyons and Eymann filed a joint motion to suppress evidence and a supporting memorandum; they alleged multiple constitutional violations during their encounter with law enforcement. The district court held a hearing on the motion and, in October 2016, denied it. Two years later, Eymann entered a conditional plea of guilty to conspiracy to distribute marijuana, reserving the right to appeal the district court's suppression decision. Lyons proceeded to trial, and a jury convicted him of conspiracy to distribute marijuana and aiding and abetting the possession of marijuana with the intent to distribute; it acquitted him of the gun charge. The district court sentenced Eymann to 10 months' imprisonment and Lyons to concurrent sentences of 27 months on each count.

## II

We review a district court's denial of a motion to suppress under a dual standard of review: we apply the clear error standard to its factual determinations, with special deference to its credibility determinations, *United States v. Villalpando*, 588 F.3d 1124, 1127 (7th Cir. 2009); but we take a *de novo* approach to its conclusions of law. *Id.*

## A

Eymann and Lyons first contend that all the evidence the police collected must be suppressed because it all flowed from the encounter in the Quality Inn parking lot, and that encounter was, at a minimum, an impermissible *Terry* stop that was not supported by reasonable suspicion. They also argue that

even if the officers had reasonable suspicion to do something, their actions exceeded the scope of a *Terry* stop.

The Fourth Amendment protects persons from "unreasonable searches and seizures." U.S. Const. amend. IV. Generally, seizures are "reasonable" only when they are based on probable cause. *Dunaway v. New York*, 442 U.S. 200, 213 (1979). The Supreme Court recognized an exception to the probable-cause rule in *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, police officers may briefly detain a person for investigatory purposes based on the less exacting standard of reasonable suspicion that criminal activity is afoot. 392 U.S. at 21–22.

*Terry* does not, however, lift all restrictions on police action. Reasonable suspicion exists only when an officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. In making reasonable-suspicion determinations, we "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch'" but "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000). Ultimately, the determination of reasonable suspicion "must be based on commonsense judgments and inferences about human behavior." *Id.* at 125.

Eymann and Lyons argue that the officers had nothing more than a hunch when they stopped the two men in the hotel parking lot, but the record demonstrates otherwise. First, the officers on the scene were aware of the suspicious details of the plane's and pilot's flight history. Based on AMOC's tip,

the officers knew that at least twice, the plane had flown from California to Pennsylvania and back and remained on the ground for only a matter of hours before returning. Officers also knew that Lyons was the pilot on at least one trip. Such quick-turn flights, although not necessarily illegal, may contribute to reasonable suspicion of criminal conduct. See, *e.g.*, *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (flying 20 hours from Hawaii to Florida and staying only 48 hours in Florida contributed to reasonable suspicion); *United States v. Simpson*, 609 F.3d 1140, 1151–52 (10th Cir. 2010) (driving from Nebraska to spend only one night in Reno contributed to a finding of reasonable suspicion); *United States v. Ehlebracht*, 693 F.2d 333, 337 (5th Cir. 1982) (four hour and 30 minute stop before returning after a long trip was suspicious).

In addition, during these quick-turn flights, the plane often landed at small, rural airports to refuel at hours when the airports and airport buildings were effectively closed. Although such travel patterns are not illegal, they may contribute to reasonable suspicion, given that they could assist in shielding criminal conduct from detection. *United States v. Michel*, 588 F.2d 986, 998 (5th Cir. 1979) (finding reasonable suspicion in part because "small country airports [a]re often used by marijuana smugglers to fly loads in after the airfields closed"). This factor may cut both ways, however, because a pilot who lands at a closed airport apparently must use a credit or debit card to refuel from a self-service gas pump. This leaves a paper trial that could be avoided by refueling at an open airport where the pilot could pay with cash.

The district court also noted that the agents were aware that the plane had flown to Watsonville and Cloverdale, California—places where AMOC had previously found drug

trafficking. Courts have held that flights to or from high drug trafficking areas may properly contribute to reasonable suspicion. See *United States v. Espinosa-Alvarez*, 839 F.2d 1201, 1206 (7th Cir. 1987); *United States v. Palen*, 793 F.2d 853, 857 (7th Cir. 1986). On the other hand, in this era of increasing legalization of marijuana, coupled with widespread cultivation, we consider this only a small nudge in the direction of reasonable suspicion.

We do agree with the district court's determination that the airplane's alleged travel through bad weather did not contribute to reasonable suspicion. In his email, Keller flagged that the plane had flown through a storm. The radar image that AMOC provided, however, did not show the plane flying through bad weather. Instead, it showed the plane's flight path over Indiana and Illinois. Stormy weather is visible in the plane's past route at the time the image was captured. That picture is not evidence that the stormy weather existed when the plane was in that spot; the storm clouds could have moved into the route after the plane had flown by.

Eymann and Lyons attack the evidence we have just summarized with the contention that the agents should not have relied on any information provided by Keller. They argue that this basis is no better than the one in *Florida v. J.L.*, 529 U.S. 266 (2000), where the Supreme Court found that police lacked reasonable suspicion for a *Terry* stop. *Id*. at 274. There, the officers' suspicion that the defendant was carrying a weapon "arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller." *Id.* at 270. Also, the anonymous call concerning the defendant "provided no predictive information and therefore left the police without means to test the informant's

knowledge or credibility." *Id.* at 271. Eymann and Lyons emphasize that Harrington had never dealt with Keller and thus could not assess Keller's reputation. In addition, they say, whereas the *J.L.* defendant's carrying of a firearm was a crime, no one reported any crime by them. Keller reported only suspicions about otherwise lawful activity.

But Keller and Spencer were far from anonymous informants. They both worked for DHS's Air and Marine Operations Center, which is part of DHS's Customs and Border Protection section and which, according to its website, "uses sophisticated technology to detect, identify, track, and direct the interdiction of suspect aviation and maritime targets in the Western Hemisphere." See cbp.gov, Air and Marine Operations Leadership and Organization. One of AMOC's jobs is to monitor airplane activity to reduce drug trafficking by air. Spencer and Keller were both acting within the scope of their official responsibilities when they passed along their information about the Cessna to Harrington. Also, a similar tip from AMOC in the past had led to the seizure of illegal drugs. Spencer gave Harrington specific details, and the Litchfield team witnessed firsthand activity by Eymann and Lyons that corroborated the tip. Finally, the possible lawfulness of a person's actions does not defeat reasonable suspicion. See *Navarette v. California*, 572 U.S. 393, 403 (2014).

The information that Harrington received from Keller (via Spencer) also falls within the collective-knowledge doctrine. Under the collective-knowledge doctrine, officers may carry out a stop even if they do not have firsthand knowledge of the facts amounting to reasonable suspicion. See *United States v. Harris*, 585 F.3d 394, 400 (7th Cir. 2009). Instead, "where law enforcement authorities are cooperating in an investigation,

as here, the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983). Collective knowledge also applies to information that an officer receives from those with the "training, responsibility or authority to make a determination of reasonable suspicion." *United States v. Colon*, 250 F.3d 130, 137 (2d Cir. 2001).

Spencer was a law-enforcement officer at AMOC. Harrington and the other DHS and LPD officers involved in the stop were entitled to rely on Spencer's information, including the report he received from Keller. Keller, as an intelligence research specialist at AMOC, is responsible for detecting suspicious activity among airplanes and sharing that information with the appropriate officer(s). Therefore, the information Harrington received from Spencer, which included information from Keller, properly contributed to a finding that the officers had reasonable suspicion to stop Eymann and Lyons in the hotel parking lot.

B

The next question is whether the parking-lot encounter exceeded the scope of a *Terry* stop. To be lawful, "a detention must be limited in scope and executed through the least restrictive means." *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). "A seizure becomes an arrest when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* (internal quotation marks omitted). "The line between a lawful *Terry* stop and an unlawful arrest is not bright." *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005). "Several factors are relevant in deciding whether a *Terry* stop has become an arrest[,] including the officer's intent in stopping the

individual, whether there was a search, whether, or how much, questioning occurred, whether there was a show of force and whether the person stopped could be said to have been taken into custody." *United States v. Rodriguez*, 831 F.2d 162, 166 (7th Cir. 1987).

Eymann and Lyons, with the support of our dissenting colleague, argue that the encounter in the parking lot, before they were handcuffed, was more akin to an arrest than the limited detention permitted under *Terry*. They point to the following factors: the encounter occurred at night; the agents did not advise them that they were free to leave; the agents parked their vehicles in a way that did not allow the courtesy car to leave; two of the police vehicles activated emergency lights; the agents stood close to the two men and blocked their entrance to the hotel; several officers were present and their weapons were visible; and the officers took the men's identification cards.

The answer to the question whether they were under arrest depends significantly on the underlying facts. The district court found that there was no arrest until the officers handcuffed the two after they found marijuana in Eymann's bag. The earlier show of force, it found, was minimal. Although there were quite a few uniformed officers and police cars, and some of the cars had flashing lights, the officers did not draw any weapons or raise their voices. This level of force is normally not associated with a formal arrest. See *Askew*, 403 F.3d at 508–09 (surrounding suspect's car to prevent him from leaving did not convert stop into arrest). In addition, the officers investigated their suspicions by questioning Eymann and Lyons immediately. These actions aligned with the purpose of the investigatory stop, as officers are "permitted to ask

questions to determine an individual's identity and to obtain information confirming an officer's suspicions." *United States v. Johnson*, 680 F.3d 966, 974 (7th Cir. 2012), overruled on other grounds by *Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016); see *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty*, 542 U.S. 177, 187–88 (2004). The duration of the questioning was also brief. The officers asked the pair about their travel plans until Lyons experienced his medical episode. At that point, the officers turned their focus to Eymann. Agent Harrington asked Eymann whether he had brought any marijuana. The tone, the district court found, was calm and conversational, and the questioning did not indicate that either Eymann or Lyons was under arrest at that point.

Eymann and Lyons's strongest argument is that the officers themselves characterized the stop as an arrest at the state suppression hearing. Worse, they say, Wilkinson's and Jarman's testimony at the state suppression hearing in March 2014 actually conflicted with their testimony at the federal suppression hearing in 2015 and 2016. Eymann and Lyons emphasize that, at the state-court suppression hearing, Wilkinson unequivocally said that the defendants were "in custody" when the police officers arrived at the Quality Inn parking lot, and his choice of that phrase amounts to an admission that the stop was an arrest. At that point, they contend, the officers lacked probable cause to make those arrests, and so the arrests were illegal and the evidence gathered afterwards must be suppressed.

We have taken a close look at both the state-court and the federal-court records, however, and we are satisfied that they are not in conflict. At both hearings, Wilkinson and Jarman emphasized that Eymann and Lyons were "not free to leave"

from the moment the officers arrived at the Quality Inn park-
ing lot. In addition, at both hearings, Wilkinson equated "not
free to leave" with being in custody. Wilkinson's use of the
word "custody" (which he uses at both hearings) appears to
be based on the fact that the defendants were not free to leave.
There is no reason to think that he was offering a legal opinion
about whether their situation qualified as "custody" under
the law. See *Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995)
(ultimate question whether a person is "in custody" is a
mixed question of law and fact and receives plenary review).

We learn little from the fact that the defendants were not
free to leave, because that is also true in standard *Terry* stops.
That constraint signals only that the interaction was not
merely a consensual encounter. See *United States v. Williams*,
945 F.2d 192, 196 (7th Cir. 1991). Moreover, the question
whether a person is under arrest is an objective one, not one
that depends on the officers' beliefs. *Ienco*, 182 F.3d at 523.

Because the officers used little show-of-force, kept their
questioning within reasonable bounds, and acted consistently
with an investigatory detention, we conclude, as the district
court did, that a reasonable person would not have under-
stood that his freedom was restrained to the degree associated
with a formal arrest during the period before the handcuffing.

## C

Eymann and Lyons next argue that the officers did not
have probable cause to search the car. Probable cause to
search a vehicle exists "if, given the totality of the circum-
stances, there is a fair probability that contraband or evidence
of a crime will be found in a particular place." *United States v.
Scott*, 516 F.3d 587, 589 (7th Cir. 2008) (internal quotation

marks omitted). "Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *United States v. Harris*, 403 U.S. 573, 583 (1971). Once Eymann admitted to having marijuana in the car, the officers had probable cause to search it, unless there is some problem with the admission.

That is the route Eymann tries to take. He says that he was under arrest before he made the admission and that he made the statement only in response to Agent Harrington's post-arrest questioning. That taints the admission, he argues, because he had not yet received his *Miranda* warnings, and so it cannot be used to establish probable cause. One problem with this argument is that, as the district court found, Eymann had no privacy interest in the car and thus could not challenge its search. We need not opine on that point. Eymann's argument works only if he was in custody while he was being questioned, and we have concluded that he was not. His admission therefore gave the officers probable cause to search the courtesy car.

### D

Once the marijuana was found in Eymann's luggage, the officers had probable cause to arrest Eymann. We are left with Lyons's arguments about his frisk and arrest.

We start with the frisk. "For a frisk to be lawful, it must be based on reasonable suspicion that 'criminal activity may be afoot and that the persons with whom [the officer] is dealing may be armed and presently dangerous.'" *United States v. Lopez*, 907 F.3d 472, 485 (7th Cir. 2018) (quoting *Terry*, 392 U.S. at 30). "[G]iven the … burdensome intrusion of a frisk, such

action should only be allowed when the officer can point to articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger." *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013).

Lyons asserts that the officers had no reason to think he was armed or dangerous. He emphasizes that mere suspicion of drug trafficking is insufficient to justify a frisk. Lyons, however, failed to raise this argument before the district court, and so he may not raise it now for the first time on appeal. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). Although the motion to suppress contained many arguments, an improper frisk was not one of them.

### E[1]

We now turn to Lyons's arrest. Lyons argues that the officers did not have probable cause to arrest him after they found Eymann's marijuana. "Probable cause for an arrest exists if an officer reasonably believes, in light of the facts and circumstances within his knowledge at the time of the arrest, that the suspect has committed, or is committing, an offense." *Thompson v. Wagner*, 319 F.3d 931, 934 (7th Cir. 2003), as amended on denial of reh'g (Mar. 14, 2003). We must "examine the events leading up to the arrest" and then determine "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

---

[1] Section II.E. represents the views of only Chief Judge Wood. As explained in her concurrence, Judge Sykes concludes that the officers had probable cause to arrest Lyons. Judge Hamilton dissents on grounds explained in his separate opinion.

The district court found that there was probable cause to arrest Lyons because the officers knew that (1) he had been in the car with both Eymann and Eymann's marijuana, (2) he had been carrying $2,600 in cash (and missed by a thousand dollars how much he had, when he responded to the officer's question), (3) he unloaded a box from a plane that had been involved in numerous quick-turn trips and that often landed at rural, closed airports, and (4) upon being confronted by law enforcement, he experienced a fainting episode. The district court also cited *Pringle*, 540 U.S. 366, noting that the Supreme Court held that officers who found drugs in a car had probable cause to arrest all three of the car's passengers where the drugs were accessible to all three men and all three failed to offer information about the drugs' ownership.

*Pringle* is not very helpful, as it is easily distinguishable. Whereas the suspects in *Pringle* refused to concede ownership of the drugs, Eymann frankly admitted to his ownership of his personal-use marijuana. The officers had no reason to doubt Eymann's claim that the drugs were his, and the quantity did not lend itself to a shared-ownership theory. The other reasons the district court listed for finding probable cause are also weak. Although Lyons experienced a fainting spell, "[m]ost people, when confronted by a police officer, are likely to act nervous, avoid eye contact, and even potentially shift their bodies as if to move away from the area." *Williams*, 731 F.3d at 687. And, as noted earlier, the question whether there was a box at all is disputed, much less whether the existence of a box on an airplane—one that did not make it into the courtesy car—is anything but innocuous. For these reasons, Chief Judge Wood concludes that the officers did not have probable cause to arrest Lyons.

F

Our focus, however, is on the evidence the police seized, not the validity of the arrest for its own sake. Lyons and Eymann argue that Lyons's unlawful arrest led to the search of the Cessna, and so the evidence of the marijuana stash must be suppressed. (As nothing turns on it, we assume for present purposes that both had enough interest in the Cessna to complain about this search.) They note that when the officers arrested Lyons, they found and took the airplane's keys, and they used those keys to open the airplane during the search. The pair compares these events to the events in *United States v. Ienco*, 182 F.3d 517 (7th Cir. 1999). In *Ienco*, police arrested two men without probable cause. *Id.* at 524–25. While the two were unlawfully detained in the back of the police car, one accidentally dropped the key to their van. *Id*. at 528. Hours later, the police found the key and used it to gain access to the van, where they found weapons. *Id.* at 522. Affirming the district court's motion to suppress the weapons as evidence, we held that "if the arrest was illegal, evidence obtained by the discovery of the key hidden in the police car and the ensuing discovery, impoundment, and search of the van would be inadmissible, all that being the fruit of the unlawful arrest." *Id.* at 526, 529.

The government argues that even if the arrest was improper, the inevitable-discovery doctrine applies, and on that basis the evidence from the airplane should not be suppressed. Under the inevitable-discovery doctrine, if the prosecution can establish by a preponderance of the evidence that the challenged evidence ultimately would have been discovered through lawful means without regard to the constitutional error, then the evidence is not subject to suppression.

*United States v. Jones*, 72 F.3d 1324, 1330 (7th Cir. 1995). To sat-
isfy this burden the government must demonstrate (1) that "it
had, or would have obtained, an independent, legal justifica-
tion for conducting a search that would have led to the dis-
covery of the evidence," and (2) that it "would have con-
ducted a lawful search absent the challenged conduct." *United
States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009). The
doctrine is premised on the idea that law enforcement
"should be placed in no better, but no worse, a position than
they would have been had no impropriety occurred." *Jones*,
72 F.3d at 1330.

Although the district court did not reach inevitable dis-
covery (because it found no constitutional errors), our conclu-
sion with respect to Lyons's arrest makes it necessary for us
to address this point. We may do so, because the parties de-
veloped the necessary record in the district court.[2] The first
question is whether the government had an independent, le-
gal justification for conducting the search of the plane that led
to the discovery of the marijuana. We are satisfied that it did.
When the officers returned to the airport after the encounter
in the hotel parking lot, they entered the airport gate with the
permission and assistance of the airport agents. The officers
were therefore lawfully present on the runway. Moreover, the
officers were permitted to bring Arie to the plane and instruct
him to conduct an outdoor sniff test. Police officers need no
articulable reason to call in a drug-sniffing dog as long as do-
ing so does not otherwise invade a person's legitimate interest
in privacy. See *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)

---

[2] The dissent believes that further development of this issue is needed
in the district court. *Post* at 12. With respect, we see no critical gaps in the
record that require filling.

("[G]overnmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest."); *United States v. Place*, 462 U.S. 696, 707 (1983) (establishing that a dog's sniff of luggage does not constitute a Fourth Amendment search). Neither Lyons nor Eymann had a legitimate privacy interest in the marijuana in the plane. Moreover, deploying Arie did not invade Eymann's or Lyons's legitimate privacy interest because the airplane was parked on an open runway. See *United States v. Grogg*, 534 F.3d 807, 810–11 (7th Cir. 2008) ("[T]he Supreme Court has made clear that a dog sniff in a public place is not a search[,] because it is unique, in that it does not intrude on or disclose any information other than whether contraband is present, and a possessor of contraband cannot maintain a legitimate expectation that the contraband's presence will not be revealed.").

If Arie's alert on the airplane survives scrutiny, then it gave the officers probable cause to search the plane independent of anything that happened at the hotel. Lyons and Eymann contend that reliance on the dog's alert was improper, however, because Arie was uncertified at the time he sniffed the airplane. They also claim Arie was unreliable. The record establishes otherwise.

We should first say that the question whether Arie did or did not have a particular state certificate is a question of state law. The Fourth Amendment does not incorporate such state requirements; it asks only whether, objectively, the officers had probable cause to search. The record showed that Arie successfully completed many training sessions. Starting in 2007, Arie completed a 10-week program at the Illinois State Police Canine Academy. He was trained to detect various

drug odors and to refrain from alerting when odors other than the specified set (proofing odors) were present. At the end of the 10-week program, Arie was tested and evaluated in 32 different categories, and he received passing marks in each category. After that program, Arie successfully completed a three- to five-day refresher training at the Academy in 2008, 2009, 2010, 2011, and 2012. During each refresher course, Arie was tested in at least 32 categories and passed in all evaluated areas. The most recent refresher course Arie completed before July 2013 was in November 2012, less than eight months before the sniff. He earned a perfect score in 36 evaluated areas.

Outside of the Academy, Grammer and Arie completed bi-weekly trainings with other handler/dog teams. Arie also participated in additional out-of-state training programs. In addition, during a July 2012 session, Arie received special recognition for being the only dog successfully to pass a complex proofing odors test; the training included about 75 different proofing odors and no drug odors, and Arie was the only dog that went through the entire building without giving a single false alert.

Despite this record, Eymann and Lyons argue that Arie was not reliable. They assert that Arie receives a reward every time he alerts, even when no drugs are found, and so he is motivated to alert during every drug sniff. In fact, the data from 2012, they argue, shows that Arie performed 29 drug sniffs and alerted positively to the presence of drugs in all of them. In addition, they contend that even though Arie has been trained to alert passively, the evidence shows that he was aggressively alerting during the sniffs. These active alerts, they insist, undermine the district court's reliability finding. Eymann and Lyons also emphasize that Arie was not

properly certified during the sniffs. They note that even a well-trained dog is not permitted to search for drugs once its certification expires.

Taking the last point first, we reiterate that Arie's lack of a state certificate is not conclusive for federal constitutional purposes. His lack of certification was attributable to an administrative error, not incompetence on the job. Once the error was spotted, the state retroactively certified Arie for the period that included the events in question. Even in the absence of formal certification, "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Florida v. Harris*, 568 U.S. 237, 246 (2013). In addition, the 2012 data that Eymann and Lyons claim shows that Arie alerted positively 100% of the time was actually a record of only Arie's positive alerts, not of all of the drug sniffs he performed. Moreover, Arie's handler, Grammer, testified that Arie provided a passive alert during the sniffs. Although Wilkinson testified that Arie stopped, sat, and barked at the seam door, which the defendants argue is not a passive alert, the actions of stopping and sitting are consistent with a passive alert. In addition, Grammer was likely paying more attention to Arie's actions during the sniffs. We therefore agree with the district court that at the time of his sniff of the plane, Arie's alert could and did establish probable cause.[3]

---

[3] The dissent queries whether the "automobile exception" to the Fourth Amendment applies to a small airplane such as the Cessna. The issue, we believe, is not properly before us, because the defendants did not raise this point until their reply briefs. The dissent disagrees, asserting that "the [automobile-exception] question arose only in reply to the government's reliance on inevitable discovery as an alternate ground to

This brings us to the second inquiry for inevitable discovery: the government must demonstrate that it would have conducted a lawful search absent the challenged conduct. Except for Officer Wilkinson, the officers and agents are clear in their testimony that they were going to bring Arie to the plane to perform a sniff test regardless of what happened at the hotel. When asked if there was any circumstance where he would not have called Grammer to walk Arie around the plane, Jarman replied that he "would have ran [*sic*] that dog no matter what [the agents] had decided" because he had previously found drugs in a plane at the airport and did not want the Litchfield Municipal Airport to be a stop for drug couriers. Harrington testified that there were no circumstances under which he would not have made use of a drug-detection dog. He also testified that even if the Litchfield Police Department did not make Arie available, he "would have contacted Illinois State Police and arranged for one of their [dogs] to assist." Mitchell testified that "regardless of how following that car turned out," "we would have definitely run the [dog] around the plane." Wilkinson's testimony was more equivocal. He said that if the federal agents decided not to run the

---

affirm." *Post* at 13 n.1. In their opening briefs, however, the defendants argued that the search of the Cessna was unlawful because Arie's alert could not establish probable cause. We would reach the probable-cause question only if the automobile exception applied to the Cessna. The defendants therefore should have taken issue with the district court's determination that the automobile exception applied in their opening briefs. We note as well that a number of circuits have found that the same approach applies to airplanes. See, *e.g.*, *United States v. Linn*, 30 F.3d 132, 1994 WL 399179, at *2 (4th Cir. 1994) (unpublished); *United States v. Rollins*, 699 F.2d 530, 534 (11th Cir. 1983); *United States v. Gooch*, 603 F.2d 122, 124 (10th Cir. 1979). Because the issue has not been properly presented here, we do not need to resolve this point.

dog around the plane, he was not sure whether he would have ordered Arie to be deployed. He "would have had to try to validate why their suspicion was no longer valid or [why] they didn't want to pursue their suspicion, and then [he would] have to make a decision."

Wilkinson's lack of certainty is not enough, in our view, to overcome the testimony of all the other officers to the effect that the airplane was the central focus of their interest. This record shows that they would have walked Arie around the plane even if they had not improperly arrested Lyons. Both Eymann, whose arrest does pass muster, and Lyons were in the plane, and all the other information suggesting that the plane was being used for illegal drug operations was still there. Wilkinson indicated that he would probably have deferred to the federal agents, and the federal agents testified that they would have deployed Arie no matter what. Lyons's arrest was largely beside the point. The inevitable-discovery doctrine therefore applies, and the district court correctly refused to suppress the evidence found in the plane.

## G

Lastly, Lyons argues that the district court erred in finding that the government was not collaterally estopped from litigating the suppression hearing in federal court. Recall that before the federal charges were filed, the Montgomery County Circuit Court found that Arie's alerts on the courtesy car and the plane could not establish probable cause because Arie was not technically certified as a drug-detection dog during those sniffs. The state court determined that 50 ILCS 705/10.12 precluded finding probable cause from an alert by an uncertified dog. That finding prompted the state court to suppress the evidence from the plane.

Collateral estoppel (or as we now say, issue preclusion) is "properly applied when an issue raised by a party to a suit has been actually and necessarily litigated *in a prior suit* and when the party against whom estoppel is asserted has had a 'full and fair opportunity' to litigate the issue." *United States v. Sherman*, 912 F.2d 907, 909 (7th Cir. 1990). "The four requirements of collateral estoppel are that: (1) the issue sought to be precluded is the same as that involved in the prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action." *Id.*

Requirement 4 is not met here. Lyons argues that the state suppression hearing provided the federal government a full and fair opportunity to vindicate its rights, but the United States was not a party to the state action or otherwise represented in it. Issue preclusion "cannot apply here because it holds only between the same parties, whereas the United States was not represented in the prior case." *United States v. Brocksmith*, 991 F.2d 1363, 1367 (7th Cir. 1993). Although the United States and Illinois worked together in the investigation of the offense, joint law enforcement effort does not mean the prosecuting entities are in privity for the purposes of issue preclusion. *United States v. Davis*, 906 F.2d 829, 834 (2d Cir. 1990). The United States is not bound by the state court's resolution of the suppression issue.

We therefore AFFIRM the district court's denial of Eymann and Lyons's motion to suppress, and thus the judgments entered against both defendants.

SYKES, *Circuit Judge*, concurring. I join Chief Judge Wood's opinion except for Part IIE, which concludes that DHS Special Agent Harrington and his law-enforcement team lacked probable cause to arrest Lyons. In my view, the officers had probable cause to arrest Lyons based on the following facts known to them at the time:

- Lyons piloted at least one of the cross-country, quick-turn Cessna flights from California that prompted the call and email from DHS's Air and Marine Operations Center to Agent Harrington. That flight—on the weekend of June 21, 2013—followed the same pattern as the one just a few weeks before on the weekend of May 24. During both trips, the plane landed at small, rural airports late at night, when the airports were otherwise closed, and used self-service pumps to re-fuel.

- Lyons's wife owned the plane.

- When Harrington frisked Lyons, he felt what he thought was a wad of cash in his pocket. When asked about it, Lyons said it was an envelope containing $1,600. But the envelope actually contained $2,600 in cash. Misstating the amount by $1,000 was suspicious.

- Lyons said the cash was for fuel and expenses, but Harrington knew that the self-service pumps at rural airports do not take cash. This added to the suspicion.

- Lyons's fainting spell: Nervousness may be common in a police encounter, but fainting is unusual, as Harrington testified. This goes beyond the garden-variety nervousness mentioned in *United States v. Williams*, 731 F.3d 678, 687 (7th Cir. 2013).

These facts—and the discovery of Eymann's marijuana—add up to probable cause. I agree, however, with Chief Judge Wood's analysis and application of the inevitable-discovery doctrine. So my disagreement on the probable-cause point means only that we end up in the same place for two reasons.

HAMILTON, *Circuit Judge*, dissenting. I agree with several portions of the majority opinion, but I differ from the majority on three decisive issues. First, the initial police tactics in the hotel parking lot amounted to unjustified arrests without probable cause, not merely an investigative stop. Second, even if the parking lot encounter were only an investigative *Terry* stop, the police lacked reasonable suspicion at the outset even to stop Eymann and Lyons. Reasonable suspicion should require more than the curiosity of law enforcement officers. Third, the majority errs in deciding the fact-intensive issue of inevitable discovery, which the district court did not reach. I would vacate both defendants' convictions and remand for fact-finding on the government's affirmative defense of inevitable discovery. I respectfully dissent.

I.  *The Arrests in the Hotel Parking Lot*

A reasonable person surrounded by the police in the hotel parking lot that night would have understood that he was under arrest. In fact, the police officers testified in the state trial court that Eymann and Lyons were under arrest from the moment they were surrounded in the parking lot—at least one officer explicitly, with the others confirming factual details indicating that the encounter was an *arrest*. Police Chief Wilkinson testified:

> Q. Was Mr. Eymann arrested at that point [when the police cars pulled up behind their vehicle]?
>
> A. He was in custody, yes, sir.

In response to a question about "arrest," that answer cannot plausibly be explained, as the majority opinion does, as having meant "only a *Terry* stop." A year later, though, the

officers changed their testimony in the federal district court. This time, they claimed the initial detention was only a *Terry* stop. But these experienced police officers knew the difference between an arrest and a *Terry* stop when they testified in state court. They were right the first time.

The line between a *Terry* stop and an arrest is "not bright," *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005), but it is exceedingly important. *Terry* recognized a "wholly different kind of intrusion upon individual freedom" based, for the first time, on less than probable cause to believe the suspect was engaged in crime. *Terry v. Ohio*, 392 U.S. 1, 26 (1968). If courts allow law enforcement officers to cloak as "investigatory stops" what are really just arrests without probable cause, all of us will have less liberty than the founders established for us in the Fourth Amendment.

The majority concludes that the parking lot encounter was a *Terry* stop "[b]ecause the officers used little show-of-force, kept their questioning within reasonable bounds, and acted consistently with an investigatory detention," such that "a reasonable person would not have understood that his freedom was restrained to the degree associated with a formal arrest during the period before the handcuffing." Ante at 16**.**

I disagree. While there is no bright line between an arrest and a *Terry* stop, "common sense and ordinary human experience must govern." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). As many as nine officers in multiple marked cars pulled in behind defendants' car, blocking it in. At least two cars were flashing their colored emergency lights. The armed and uniformed officers, some in tactical gear and body armor, then approached the defendants. A few moments later, an officer took the defendants' identification and did not return it.

Eymann and Lyons were then separated before Eymann was questioned. Chief Wilkinson confiscated the keys to the airport courtesy car that the men had been driving. Common sense and ordinary human experience should convince us that this scene was not consistent with the notion of a brief encounter "to ask you a few questions."

These facts are sufficiently similar to those of *United States v. Ienco*, 182 F.3d 517 (7th Cir. 1999), to show an arrest: a significant show of force, overwhelming police presence, and identification and keys taken and kept by the police. See *id*. at 525, citing *Florida v. Royer*, 460 U.S. 491, 501–02 (1983) (where officers at airport identified themselves as narcotics agents, told defendant that he was suspected of transporting narcotics, and asked him to accompany them to a police room, while retaining his airline ticket and driver's license without indicating in any way that he was free to depart, defendant was effectively seized for purposes of Fourth Amendment), *United States v. Gonzalez*, 763 F.2d 1127, 1131–32 (10th Cir. 1985) ("arrest" found where police held driver's license, car registration and title), and *United States v. Miller*, 589 F.2d 1117, 1127 (1st Cir. 1978) (police officer's retention of the defendant's driver's license which prevented the defendant from lawfully driving his car was more of an arrest than a mere investigatory stop). We have also held that large numbers of armed police tend to indicate that a defendant was in custody. See, e.g., *United States v. Slaight*, 620 F.3d 816, 820 (7th Cir. 2010); *United States v. Borostowski*, 775 F.3d 851, 860–61 (7th Cir. 2014).

What happened here was distinct from the common police practice of asking for and briefly inspecting identification during a traffic stop, cf. *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 186 (2004), and *United States v. Hensley*, 469 U.S. 221,

229 (1985). In such routine stops, most drivers expect to receive their identification back within a few minutes. With no driver's licenses, and no expectation of getting them back any time soon, and amid an overwhelming police presence, Eymann and Lyons were effectively under arrest from the outset.

Finally, I cannot overlook the testimony of Chief Wilkinson in the state court hearing on the motion to suppress (which was eventually granted, leading to this Plan-B federal prosecution). In the state court, the Chief testified that the encounter with Eymann and Lyons in the hotel parking lot was an arrest from the start. Chief Wilkinson is an experienced officer who surely knew the difference between an arrest and a *Terry* stop. In a hearing on the broad-based motion to suppress, he testified this was an arrest. (The Illinois State's Attorney never even contested this point: he said in his closing argument that "The state is not going to try and sit here and argue that they weren't in custody.") I'm troubled by Chief Wilkinson's changed testimony on this critical point after the prosecution lost the motion to suppress in state court. He was right the first time.

The government does not claim, and could not claim, that the officers had probable cause to arrest Eymann or Lyons in the opening moments of the encounter in the parking lot. This was an arrest without probable cause, and all of the evidence obtained through the unlawful arrest should have been suppressed.

II. *No Reasonable Suspicion to Detain*

Even if the parking lot encounter were properly deemed only an investigative *Terry* stop, it was unconstitutional. The

officers had received information that they could reasonably deem worth investigating. That information fell short, however, of grounds to *stop* Eymann and Lyons at the hotel that night and thus to deprive them of their liberty. The officers needed "a reasonable suspicion, grounded in specific and articulable facts," that the men had committed a felony or were about to commit a crime. *Hensley*, 469 U.S. at 229; *United States v. Lopez*, 907 F.3d 472, 478 (7th Cir. 2018). They did not have it.

The Air and Marine Operations Center (AMOC) analyst passed on to officers that a single-engine Cessna was worth investigating further because it had made prior quick-turn trips and used self-service fuel pumps late at night. Although the analyst said that these attributes were "similar to previous violators," the analyst also told the officers that "the plane, owner, and pilot [were] nonsuspect." (Like the majority, I give little weight to the California origins of the flights or to the mistaken impression that the plane had flown into bad weather.) In short, the AMOC information did not set Eymann, Lyons, or their plane apart from the pool of law-abiding pilots who make quick-turn trips or use self-service fuel pumps at night.

It is critical to respect the difference between the quantum of suspicion required to *stop* a suspect and what is required merely to *investigate*. No more than interest or curiosity on the part of the police is required to investigate. Neither is enough to justify an investigative *stop*, intruding on a person's liberty.

To make a lawful stop, police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that in-

trusion." *Terry*, 392 U.S. at 21. Though law enforcement officers are entitled to a certain amount of deference, courts must still ensure that reasonable suspicion rests on an adequate objective basis. See, e.g., *id.* at 21–22. Without an objective basis giving rise to individualized suspicion, nothing sets apart those reasonably suspected of criminal activity from those innocent Americans going about their daily lives—an outcome that is inconsistent with the mandate of the Fourth Amendment. *Kansas v. Glover*, 140 S. Ct. 1183, 1190 (2020) (reasonable suspicion does not "allow officers to stop drivers whose conduct is no different from any other driver's"); *United States v. Flores*, 798 F.3d 645, 649 (7th Cir. 2015) (explaining that a "suspicion so broad that [it] would permit the police to stop a substantial portion of the lawfully driving public," such as that based on a license plate frame that obstructed a license plate in exactly the same way as every other license plate frame, was unreasonable).

By definition, the grounds for a *Terry* stop can be less than those required for probable cause. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). But when the activity is much more likely to be explained by innocent behavior than by criminal, the inference is weakened so that it cannot meet even the relatively low standard for reasonable suspicion.

Consistent with *Glover*, we have looked for a stronger connection between fact and inference than the officers had here. In *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014 (7th Cir. 2016), we held that a police officer's observation that a driver had his cell phone in hand with his head bent toward the phone while driving was not enough to support reasonable suspicion that he was breaking Indiana law by texting while driving. The officer's observations did nothing to separate the

driver's behavior from any of the many other lawful uses of a cellphone while driving, all of which, except for texting, were then legal under Indiana law. *Id*. (The statute, Ind. Code § 9-21-8-59, has since been amended effective July 1, 2020 to allow only hands-free use of cellphones while driving. See Pub. L. 100-2020, § 3 (2020).)

The government argues here that Eymann and Lyons fit criteria for drug couriers. The problem is that the profile criteria were so general and so likely to point to innocent behavior that—without further investigation—it was not possible to gauge the likelihood that a specific plane or person was involved in criminal activity. AMOC itself told the officers from the outset that "the plane, owner, and pilot [were] nonsuspect." Even the factors noted by the AMOC as worthy of investigation were not probative of much. The record sheds no light on how often "quick turnaround" flights are evidence of crime. Private planes are expensive items to leave idle, after all, and they make sense not just for drug couriers but for anyone who does not want to be tied to airline schedules and major airports. There are lots of lawful reasons to fly from California to other parts of the country. And using small, closed airports to refuel requires pilots to leave a trail by paying for fuel with a credit card, and seems to be common enough among law-abiding pilots to support the "courtesy car" practice allowing pilots to borrow cars on the honor system.

What the government here has called "reasonable suspicion" for *Terry* purposes was only interest or bare suspicion that simply was not enough to justify a coercive, non-voluntary stop. *Paniagua-Garcia*, 813 F.3d at 1015. We were concerned in *Paniagua-Garcia* by how remote the likelihood of

criminal activity was. We compared the case of a driver drinking from a coffee cup. The coffee *could* be spiked with alcohol, or the driver *could* be driving on an expired license. *Id.* Without more specific grounds for individual suspicion, however, those possibilities could not justify a stop.

American liberty requires us to enforce the difference between grounds to investigate by non-coercive means and reasonable suspicion to carry out a *Terry* stop. What judges and lawyers blandly call "*Terry* stops" can be highly intrusive. With the authority to stop comes the authority to require the subject to submit to the stop, and to use reasonable force to make him submit. *United States v. Place*, 462 U.S. 696, 702 (1983) (*Terry* implicitly acknowledged authority of police to make forcible stop based on reasonable suspicion); *Adams v. Williams*, 407 U.S. 143, 146 (1972) (upholding forcible stop based on tip from reliable informant). Such situations can escalate quickly to violence and even death. See, e.g., *Tom v. Voida*, 963 F.2d 952, 954 (7th Cir. 1992) (attempt to make justified *Terry* stop led to officer fatally shooting subject); *Brown v. City of Milwaukee*, 288 F. Supp. 2d 962 (E.D. Wis. 2003) (*Terry* stop based on mistaken identification resulted in permanent injuries and pain).

Here, when the officers encountered Eymann and Lyons, as in *Paniagua-Garcia*, they had information indicating at most that criminal conduct was possible. It's not surprising that some small planes are used to transport drugs, but the record tells us nothing about how suspicious the behavior that AMOC observed was. By comparison, case law shows that many drug couriers drive cars on long trips on interstate highways. That fact, without more, is not enough to justify a *Terry*

stop on any car with out-of-state plates on an interstate high-
way. Courts insist instead that stops of vehicles be based on
much more specific information, including violations of traf-
fic laws.

The facts here contrast sharply with a case cited by the
government, *United States v. Latorre*, 893 F.3d 744, 748, 751
(10th Cir. 2018), which affirmed the denial of a motion to sup-
press. The police in *Latorre* knew of the private plane's unu-
sual flight pattern, but they also knew the pilot had a history
of arrests for drug possession and distribution. Most signifi-
cant, the pilot was flying without using the required identifi-
cation transponder. There may be legitimate reasons for that
last point—perhaps the transponder has suddenly stopped
working – but it is certainly suspicious. The Tenth Circuit held
that the three factors *together* supported reasonable suspicion,
and the lack of transponder was the most compelling. See *id.*;
see also *Royer*, 460 U.S. at 502 (officers had reasonable suspi-
cion for initial *Terry* stop where drug courier paid for ticket in
cash under an assumed name). In this case, by contrast,
AMOC cited no behavior that indicated a desire to avoid de-
tection. In fact, the opposite was true. When Eymann and Ly-
ons stopped to refuel, they paid with a credit card that rec-
orded the transaction.

The patience shown by Officer McFadden in *Terry* itself is
also instructive here. Two men on the street caught his eye.
*Terry*, 392 U.S. at 5. At first, he could not say why they raised
his suspicion, so he waited and watched. He saw them pace
past and peer into a store many times, an activity that looked
to him like casing the store for a robbery. The officer contin-
ued to watch. He saw the two men have a brief conversation
with a third man, who then left. The two men then resumed

their activity in front of the store. The officer still did not attempt to detain them. He continued to investigate without seizing anyone. As the two men began walking away, he followed them. When they met up with the third man once again, Officer McFadden finally stopped them and found concealed weapons. *Id*. at 7. *Terry* thus showed the development of the officer's reasonable suspicion, starting from a vague hunch that two men on the street were up to no good, to finally observing enough suspicious actions that stopping them had become reasonable. It was critical that the officer took the time to observe something objectively suspicious before initiating his stop.

As with the initial hunch in *Terry*, the officers who received AMOC's information had enough reason to investigate, by watching. But unlike in *Terry*, the defendants here demonstrated no behavior that was clearly suspicious. The police here did not take the time to use the information from AMOC to see if the subjects started behaving in unusual and objectively suspicious ways. The officers here were much too hasty. They moved in to detain Eymann and Lyons well before they had grounds to set them apart from the general, law-abiding population. The officers violated the Fourth Amendment by detaining them.

I do not suggest that the officers could not take any action on the basis of the information from AMOC. The alert from AMOC was to *be on the lookout*. It gave the officers a basis to investigate—to observe the subjects and even to talk with them if they were willing—but without (yet) restraining their liberty. See *United States v. Williams*, 731 F.3d 678, 693 (7th Cir. 2013) (Hamilton, J., concurring) (anonymous call that a group

of men outside a bar were showing each other their guns justified a police response to investigate, but not to detain anyone without more reason to suspect wrongdoing when state law allowed open possession of firearms).

Stopping pilots and passengers based on only the information relied on here would allow the police to detain a substantial portion of those flying lawfully. The information provided by AMOC gave the officers reason to investigate further, but it fell short of providing the reasonable suspicion necessary to restrain anyone's movements. The entire case against Eymann and Lyons was built on that flawed foundation.

III. *Inevitable Discovery?*

The government argues that even if the arrest or stop was unlawful, the evidence seized from the plane should be admitted under the inevitable discovery doctrine. That doctrine allows the government to rescue the fruits of an unlawful search or seizure by showing, by a preponderance of the evidence, that the evidence would have been discovered through lawful means independent from any illegal search or seizure. *United States v. Jones*, 72 F.3d 1324, 1330 (7th Cir. 1995).

The wording is important: *would* have been discovered, as events actually unfolded, not hypothetically *might* have been discovered under a different and idealized set of circumstances. The government needs to show either that it would have obtained a warrant or that it would have been able to act under a valid exception to the warrant requirement. The district court did not decide or make findings of fact on the inevitable discovery theory.

The majority forges ahead and makes its own factual findings on this fact-sensitive issue. With respect, that's a mistake. First, inevitable discovery always asks for some degree of counterfactual speculation. The government's brief offers several hypotheticals as to how a dog might have been deployed lawfully to sniff the plane, even absent the invalid arrest/*Terry* stop and the defendants' ensuing admissions. That argument falls short of showing that a dog inevitably *would* have been deployed to the plane. In fact, Chief Wilkinson conceded as much when he said in the federal suppression hearing that he would not have automatically deployed a drug-sniffing dog to the plane. Other officers testified differently, but this is not a record where an appellate court should be making its own findings of fact in the first instance.

Second, in this case there are legitimate questions about the use of this dog, his training, and his reliability. The state courts have already found that the dog was not properly certified at the time of these events. How does that affect the inevitability of lawful discovery? Third, it is not clear that a warrantless search of an airplane is subject to the same rules as a warrantless search of an automobile.

It is possible that officers could have called a judge in the middle of the night to obtain a warrant after a positive alert from a reliable drug-sniffing dog, and it is true that warrants are often granted on this basis. It is not at all clear on this record that the officers would have actually done so. The scene suggests that officers had no real plan. Upon seeing Eymann and Lyons leave the airport, a federal agent made a spur-of-the-moment decision to follow them in their courtesy car. All of the agents and officers then left the airport, leaving the plane unattended. Given the number of agents and officers

who converged on the hotel parking lot, surely one or two could have been assigned to a dog sniff of the plane if that really had been a foregone conclusion. Instead, when the dog was actually deployed, it was first sent to the hotel parking lot, not the plane. Given how events actually unfolded, the government must hypothesize that the officers would have: (1) deployed a drug dog to the plane, (2) executed a proper sniff, (3) gotten a reliable positive hit, (4) applied  for a warrant, and (5) waited for a warrant. There are too many uncertainties here for us to say confidently, at least without factual findings, that the government can satisfy the strict requirements of the inevitable discovery defense for an unlawful search.

The government also argues that a warrant would not have been necessary because the automobile exception to the warrant requirement would have covered a hypothetical search of the plane based on a positive dog alert.[1]

The automobile exception has a practical purpose: to allow officers to search a car under the "exigent circumstances" in which the vehicle is readily mobile. *United States v. Castaldi*,

---

[1] Footnote 3 of the majority opinion criticizes the defendants for not raising the automobile exception question until their reply briefs. On appeal, however, the question arose only in reply to the government's reliance on inevitable discovery as an alternate ground to affirm. The district court did not reach the inevitable discovery question, so defendants did not need to address it in their principal briefs on appeal. It is now clear, however, that affirmance of at least Lyons's conviction depends on the inevitable discovery theory. The majority's point about limited briefing of the issue thus only underscores the value of having the district court address this fact-intensive question in the first instance. The only court to have considered the issue until now, the Illinois trial court, rejected the inevitable discovery theory for the search of the airplane.

453 F.2d 506, 510 (7th Cir. 1971). Under that logic, the automobile exception has been extended to other kinds of vehicles that are easy to drive away. See, e.g., *California v. Carney*, 471 U.S. 386, 393 (1985) (motor homes); *United States v. Smith*, 456 F. App'x 200, 209 (4th Cir. 2011) (travel trailer); *United States v. Navas*, 597 F.3d 492, 501 (2d Cir. 2010) (tractor trailer).

This plane was not necessarily so mobile as to have made seeking a warrant impractical. The plane was locked, the officers had its key, and it was located in a different place than Eymann and Lyons at the time of their arrests. Moreover, an airplane cannot be moved as quickly and easily as an automobile. General aviation airports are not as public as open roadways. Planes cannot easily be lost in a stream of traffic, and flights can be tracked. Refueling a plane is not as simple as stopping a car at the next highway exit. It could not be easily stolen or broken into, and it did not offer a ready means of escape. In short, this plane was going nowhere without the officers' express direction.

The automobile exception has also been justified by the diminished expectation of privacy in an automobile. See, e.g., *United States v. Matthews*, 32 F.3d 294, 299 (7th Cir. 1994); *United States v. Markling*, 7 F.3d 1309, 1319 (7th Cir. 1993) (automobile exception applied to a car in a motel parking lot because "[t]he considerations underlying the automobile exception," namely, the car's ready mobility and the driver's reduced expectation of privacy, were present). Though airplanes and airways are also regulated, a private airplane may offer much more privacy. An automobile is visible to the general public and any passerby. It has windows and a windshield that allow easy viewing of its driver, passengers, and contents. The interior of a private plane in flight is not at all

visible to the general public or even to people in other planes. Planes are not subject to being pulled over the way that automobiles are. There is little reason for pilots and passengers on private planes to think that law enforcement or the general public could easily access or see into their plane.

I would not reach a conclusion on the government's inevitable discovery defense. The better course here would be to remand these cases to the district court for factual findings in the first instance, including thorough explorations of the dog's availability and reliability and whether the police could have lawfully searched the airplane without a warrant.